UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TYWAN LEONAR JOHNSON,

Petitioner,

v.

JOHN SUTTON, Warden,

Respondent.

No.  2:17-cv-00958 KJM AC P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition at ECF No. 1, which challenges petitioner's 2015 conviction for second-degree murder and related offenses. Respondent has filed an answer, ECF No. 26; petitioner did not file a traverse.

BACKGROUND

I.      Proceedings In the Trial Court

A.  Pretrial Proceedings and Jury Selection

Petitioner was charged in Sacramento County with first-degree murder, torture, and a deadly weapon use enhancement.

Petitioner is black, and the victim was white.  During jury selection, the prosecutor exercised peremptory challenges against three black prospective jurors.  Defense counsel made a

Batson/Wheeler[1] motion, which was denied.  Details regarding the Batson issue are provided below in relation to that claim.

### B.  The Evidence Presented at Trial[2]

#### 1.  Prosecution Case

The jury heard evidence of the following facts.  On November 26, 2012, petitioner ran into his friend Cedric Mason and Mason's girlfriend at a light rail station.  The trio then ran into Mason's friend Jeff Rozenski.  All four went to Mason's mother's house to get high.  After some time, petitioner gave Rozenski money to buy more drugs.  Eventually Mason's girlfriend left, and the other three walked to a nearby veterinary clinic parking lot to smoke the methamphetamine Rozenski had obtained.  Believing the drug to be "fake," petitioner became angry at Rozenski and demanded his money back.  Mason was frightened by the ensuing argument and ran home.  He heard screams as he fled.  Later Mason and his mother drove around trying to find Rozenski, and eventually saw his bicycle reflector.  They flagged down some passing firefighters, who saw Rozenski's body in the parking lot and themselves flagged down a police officer.

Rozenski's body was found on its back on top of a bicycle, with a large laceration across the neck.  There was blood on his face and neck and cuts on his hands.  Splattered blood formed a large pattern on the wall behind his head.  Drug paraphernalia was found at the scene.

Detectives Tom McCue and Jeffrey Wallace interviewed petitioner the day after Rozenski's death.  McCue observed cuts on petitioner's fingers, some of which appeared to be recent.  Neither McCue nor Wallace observed any bruises, cuts, or other marks on petitioner's face to indicate he had been in a fight.  Nor did the detectives observe anything to lead them to believe petitioner was under the influence of alcohol.

A videotape of the interview was played for the jury.  When first asked if he had heard about the events of the previous evening, petitioner responded: "I'm gonna just tell you what

---

[1]  Batson v. Kentucky 476 U.S. 79 (1986); People v. Wheeler 22 Cal.3d 258 (1978).
[2]  This summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 4 at 2-8.  The undersigned has independently reviewed the trial transcript and finds the appellate court's recitation of the facts to be accurate.

happened.  I was drunk and I ran into some dude.  He was tripping on me so we were scuffling and then we're fighting and then it just escalated."  He had never met the man before that evening, and the man appeared to be on "some crystal or something."  Petitioner himself began to drink that day at 3:00 o'clock in the afternoon and ended up drinking a fifth of vodka and a tall can of beer.

Petitioner initially told the detectives he had run into a man he knew as "Bo" (Cedric Mason) at the light rail station, and they decided to go buy cigarettes.  As they walked in the vicinity of the veterinary clinic, a white guy on a bike bumped into petitioner.  Petitioner said something to the man, and the man got off of his bike and walked up to him.  After petitioner punched the man, the two began to fight.  As they fought, petitioner began stumbling because he was drunk.  The pair fell to the ground and the man began to pull petitioner's hair.  Petitioner told the man to let him go, and then remembered he had a knife in his pocket.  Petitioner got out the knife and warned the man he would stab him if he did not let go.  The man kept pulling petitioner's hair and punching him.  Petitioner began to stab him.  Petitioner kept stabbing the man, at one point dropping and then recovering the knife, until petitioner pushed the man off and the man finally let go of petitioner's hair.  Petitioner stabbed the man five or six times.  He threw the knife down a storm drain and went home.

Petitioner said that several family members were there when he got home.  He was "really shaky" and "scared."  He told his family he "got into it with somebody and I think I killed somebody."  Petitioner "really got all shaky" when he watched the news and discovered the man had died.  Petitioner "just couldn't believe" what he had done because he had been drunk when it happened.

In response to questioning by Detective McCue, petitioner acknowledges that he had been at Bo's house before the fight and that the "white guy" had been with them when they left the house.  Petitioner did not know the man but thought he was Bo's friend.

Petitioner subsequently provided additional details.  He stated the man had stolen $13 from him, taking advantage of him because he was drunk.  The three men smoked "crystal" together.  Petitioner had given the man $13 to buy crystal methamphetamine, but the man

returned with only a small quantity of the drug.  They all smoked two "bowls" together, using a glass pipe provided by petitioner.  After they smoked the drug, the three men walked toward the light rail station.  Bo said the man should return petitioner's money, but the man refused.  As they approached the veterinary clinic, the man walked up to petitioner.  After the man grabbed petitioner's hair and punched him, petitioner stabbed the man.  Petitioner acknowledged that he had been "a little bit" angry when he stabbed the man.  Detective Wallace asked if petitioner had been unable to stop once he began stabbing the man, and petitioner replied, "I just wanted him to let me go."

A forensic pathologist performed an autopsy on Rozenski and determined that he died from a combination of sharp and blunt injuries to the head and neck.  There were a total of 57 sharp injuries to his head and neck, 21 injuries to his hands, two sharp injuries to the back of his left forearm, and two sharp injuries to the back of his left wrist.  The pathologist determined most of the sharp injuries were "incisions, meaning they go across the body for a greater distance than they go deep into the body."  Some of the sharp injuries combined an incision injury with a stab injury; the latter "goes deeper into the body for a greater distance than it goes across the body."  Five of the injuries to Rozenski's head and neck were stab injuries.  Rozenski also suffered blunt trauma to his head and "had multiple bruises and scrapes to his head to both sides of the head, to the right eyebrow region, to the cheek bones, to the tip of the nose.  As well he did have some scrapes and bruises of his upper chest[,] his left abdomen and his left leg."

2.  Defense Case

A criminalist testified that she tested a sample of Rozenski's blood, which contained 0.03 milligram per liter of amphetamine and 0.29 milligram per liter of methamphetamine.

Another criminalist testified she tested a blood sample drawn from petitioner the afternoon after the murder.  The criminalist confirmed the presence of "Delta 9 THC," which is the parent drug for marijuana.  However, she could not say when petitioner had ingested the marijuana.  Petitioner's blood sample screened negative for the presence of methamphetamine and amphetamine, but given the half-life of the drugs, the test could not conclusively determine whether petitioner ingested methamphetamine in the 24-hour period prior to the blood draw.

4

Alan Estep testified that he had been best friends with petitioner for about 13 years. Estep was at petitioner's mother's house when petitioner arrived there the afternoon prior to the murder. Petitioner appeared intoxicated, slurring his speech and carrying a bottle of alcohol. Petitioner and Estep finished the rest of a half-full bottle of whiskey. Then the pair drank four or five shots of vodka. Petitioner left around 4:30 that afternoon, staggering and speaking incoherently. Estep believed petitioner was drunk.

Mason testified he did not see petitioner consume alcohol on the day of the murder, although petitioner did have a bottle of alcohol when they first met up at the light rail station. Petitioner offered Mason and his girlfriend a drink, which they declined. That afternoon and evening petitioner appeared to be sober, and Mason had no difficulty understanding him.

C.  Outcome

The jury found petitioner not guilty of first-degree murder but guilty of the lesser included offense of second-degree murder and guilty of torture. In addition, the jury found the weapon use allegation associated with each count to be true. The trial court sentenced petitioner to 15 years to life in prison on the murder count, plus one year for the weapon use enhancement, for a total term of 16 years. The trial court sentenced petitioner to life in prison for the torture count, plus one year for the weapon use enhancement, stayed pursuant to California Penal Code section 654.

II.  State Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on August 17, 2016. Lodged Doc. 4. The California Supreme Court denied review on November 11, 2016. Lodged Doc. 6. Petitioner filed no applications for state habeas relief.

III.  Proceedings in this Court

The instant federal petition was filed May 5, 2017. ECF No. 1. Respondent answered on January 19, 2018, ECF No. 26, and petitioner did not file a traverse.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

1

2

3

    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

4

5

6

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

8

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9

10

11

12

13

14

15

16

    The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

17

18

19

20

21

22

    The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

23

24

25

26

27

28

    A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be

1   objectively unreasonable.  <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003).

2         Review under § 2254(d) is limited to the record that was before the state court.  <u>Cullen v.</u>

3   <u>Pinholster</u>, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court

4   reasonably applied clearly established federal law to the facts before it.  <u>Id.</u> at 181-182.  In other

5   words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  <u>Id.</u> at 182.

6   Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

7   confined to "the state court's actual reasoning" and "actual analysis."  <u>Frantz v. Hazey</u>, 533 F.3d

8   724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

9   summarily, without a reasoned opinion.  In <u>Richter</u>, <u>supra</u>, the Supreme Court held that when a

10   state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

11   must determine what arguments or theories may have supported the state court's decision, and

12   subject those arguments or theories to § 2254(d) scrutiny.  <u>Richter</u>, 563 U.S. at 102.

13   <u>DISCUSSION</u>

14   I.    <u>Claim One: Prosecutorial Misconduct</u>

15      A. <u>Petitioner's Allegations and Pertinent State Court Record</u>

16         Petitioner claims that the prosecutor engaged in misconduct when he misstated

17   the heat of passion standard during his closing argument.  ECF No. 1 at 5.

18         The jury was instructed on provocation and heat of passion.  The defense theory

19   was that petitioner was guilty of manslaughter rather than murder because he stabbed

20   Rozenski in the heat of passion, and not guilty of torture because he acted in the heat of

21   passion rather than with intent to cause cruel or extreme pain.

22         The prosecutor's closing argument included the following statements regarding

23   the jury's determination whether the victim's conduct would have caused a person of

24   average disposition to act rashly and without due deliberation: [3]

25

26   [3]  The jury was instructed pursuant to CALCRIM No. 570 that a killing that would
otherwise be murder is reduced to voluntary manslaughter if (1) the defendant was

27   provoked; (2) as the result of provocation, he acted rashly and under the influence of
intense emotion that obscured reason and judgment; and (3) the provocation would have

28   caused a person of average disposition to act rashly and without due deliberation.

7

> So the question you have to ask in this case is having your money, your $13 taken from you and smoking bad dope the average person, average disposition would take out a knife and slice somebody up….
>
> …   You can't take out a knife. The average person of average disposition is not going to take out a knife and slice somebody up. They are not over $13. No. The average person may act rashly. Maybe, maybe punch somebody, maybe, maybe. And that's stretching it.
>
> But the average person of average disposition who loses $13 does not act rashly and slice, slice, slice, slice….
>
> …   They don't. That's why it is not heat of passion voluntary manslaughter because the average person of average disposition wouldn't act rashly over $13 and do that.

Reporter's Transcript ("RT") at 441-442.

Petitioner's counsel objected to all these statements, and the trial court overruled the objections.

Petitioner alleges here that the state courts "ignored the evidence that the victim had called me a [racial slur] and was hitting me in the head and pulling my hair…"  ECF No. 1 at 5.

### B.  The Clearly Established Federal Law

In reviewing prosecutorial misconduct claims, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations omitted).  "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181.

### C.  The State Court's Ruling

This claim was raised on direct appeal.  Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

8

decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The Court of Appeal ruled in relevant part as follows:

> Defendant urges reversal of his convictions for second degree murder and torture due to the prosecutor's misconduct in misstating the heat of passion standard. He argues the court erred in overruling his final two objections to the prosecutor's argument on heat of passion, violating his right to due process. The prosecutor, defendant contends, told the jury that for provocation to be sufficient for heat of passion to apply, it would have to provoke a reasonable person in defendant's position to stab Rozenski repeatedly in the face and neck, a misstatement of the law.

> Sudden quarrel or heat of passion occurs when the defendant kills because of a legally sufficient provocation. A provocation is legally sufficient if it would cause a reasonable person of average disposition to act rashly. We focus on the provocation, the surrounding circumstances, and whether they were sufficient to cause a reasonable person to act rashly. How the specific defendant responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion. (People v. Beltran (2013) 56 Cal.4th 935, 942, 157 Cal. Rptr. 3d 503, 301 P.3d 1120 (Beltran); People v. Najera (2006) 138 Cal.App.4th 212, 223, 41 Cal. Rptr. 3d 244 (Najera).)

> Therefore, if the prosecution argues that the jury focus on the reasonableness of the defendant's specific response to the provocation, it amounts to misconduct. (Najera, supra, 138 Cal.App.4th at p. 223.) Such misconduct may be intentional or inadvertent; a misstatement of the standard amounts to misconduct. (People v. Hill (1998) 17 Cal.4th 800, 822-823, 72 Cal. Rptr. 2d 656, 952 P.2d 673 & fn. 1.)

> . . .

> In the present case, the prosecutor repeatedly argued the "average person of average disposition who loses $13 does not act rashly and slice, slice, slice, slice." However, as set forth in Beltran, provocation is not measured by whether the average person would act in a certain way; the question is whether the average person would react in a certain way, with reason and judgment obscured. (Beltran, supra, 56 Cal.4th at p. 949.) The prosecutor misstated the law during argument.

> We must consider the consequences of the prosecutor's statements. Defendant argues we analyze any prejudice under Chapman v. California (1967) 386 U.S. 18, 24 [87 S. Ct. 824, 17 L.Ed.2d 705] (Chapman) and consider whether the error is harmless beyond a reasonable doubt. The

People contend we employ the standard set forth in <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836-837, 299 P.2d 243 (<u>Watson</u>) and determine whether there is a reasonable probability that but for the error the jury would have returned a verdict of voluntary manslaughter rather than second degree murder. We find the error harmless under either standard.

At trial, defendant argued he was guilty of manslaughter, not murder, because he acted in the heat of passion when Rozenski cheated him out of the money defendant had given him to buy drugs. However, the mere fact Rozenski failed to return defendant's $13 would not provide the jury with evidence an average person would experience a sudden heat of passion causing him to act rashly and without deliberation.

On appeal, defendant asserts two additional examples of Rozenski's provocation that could have convinced the jury to find him guilty of manslaughter.

First, defendant states that following his arrest he told officers he "stabbed Rozenski because Rozenski would not stop pulling his dreadlocks and hitting him in the head after the two began quarreling." However, during the interview defendant stated he struck Rozenski first after demanding repayment of the $13. "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion." <u>People v. Oropeza</u> (2007) 151 Cal.App.4th 73, 83, 59 Cal. Rptr. 3d 653.)

Second, defendant states that in his interview with officers, Mason stated that Rozenski asked Mason, "[D]o you know this nigga - do you know this nigga - do you know this nigga," referring to defendant. However, none of the evidence presented at trial reveals that defendant ever heard Rozenski's statements, much less reacted to them. Despite the prosecutor's misstatement of the law of heat of passion, we find no error under either <u>Watson</u> or <u>Chapman</u>.

Lodged Doc. 4 at 13-15.

   D.  <u>Objective Reasonableness Under § 2254(d)</u>

   When a state court denies a constitutional claim on harmless error grounds, the question on review under AEDPA is the reasonableness of the harmless error determination.  <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17-18 (2003) (per curiam).  This court must defer to the court of appeal's harmless error determination unless it was in conflict with the reasoning or the holdings of

1    Supreme Court precedent, or if it applied harmless error review in an objectively unreasonable

2    manner.  Inthavong v. Lamarque, 420 F.3d 1055, 1058-59 (9th Cir. 2005), cert. denied, 547 U.S.

3    1059 (2006).

4         Here the state appellate court found that the prosecutor had indeed misstated the law

5    during closing argument, but that the error was harmless under Chapman v. California, 386 U.S.

6    18 (1967).  This is the correct standard for evaluating errors of constitutional dimension.  See id.

7    Thus the state court held that even if the closing argument rose to the level of a due process

8    violation, the error was harmless.

9         The appellate court's harmless error determination is not in conflict with the reasoning or

10   the holdings of any Supreme Court precedent, nor did the court conduct harmless error review

11   under Chapman in an objectively unreasonable manner.  There is nothing unreasonable about the

12   state court's evaluation of the evidence, as that evidence simply did not present a plausible heat

13   of passion defense.  The court of appeal did not, as petitioner alleges, "ignore" evidence that the

14   victim was hitting petitioner and pulling his hair, or that the victim had used a racial slur.  The

15   court noted and addressed these issues in a reasonable way.  Because the jury heard a statement

16   from petitioner admitting that he threw the first punch, the ensuing fight cannot constitute

17   provocation under California law absent facts not present here.[4]  And the racial slur, while

18   referring to petitioner, was not directed at him.  There was no evidence before the jury showing

19   that petitioner actually heard those comments, let alone that they triggered or contributed to the

20   fatal encounter.  To the contrary, petitioner's own statements indicated that the fight had been

21   about the drugs and the money he paid for them.

22        Because the decision of the California Court of Appeal is not objectively unreasonable,

23   federal habeas relief is unavailable on this claim.

24   ////

25   ////

26   ////

27

28   _____

[4] This issue is addressed below regarding petitioner's second claim for relief.

11

1    II.     Claim Two: Instructional Error Regarding Imperfect Self-Defense

2           A.   Petitioner's Allegations and Pertinent State Court Record

3           Petitioner alleges that the trial court improperly instructed the jury that self-defense and

4    imperfect self-defense were unavailable to an initial aggressor.  ECF No. 1 at 7.  He contends

5    that notwithstanding that general rule, self-defense and imperfect self-defense are available to an

6    initial aggressor when the victim responds with unlawful force.  Petitioner claims that the jury

7    should have been so instructed, because there was evidence (in petitioner's statements to police)

8    that he had stabbed Rozenski in order to get Rozenski to stop hitting him and pulling his hair.

9    Petitioner argues that because he was responding to an illegal use of force by Rozenski

10   (presumably assault in the course of a theft), the homicide constituted manslaughter rather than

11   murder under the doctrine of imperfect self-defense.[5]  Id. at 36-40.

12          The jury was instructed pursuant to CALCRIM No. 505 on the elements of self-defense,

13   and pursuant to CALCRIM No. 571 on imperfect self-defense.  The trial court also gave a

14   slightly modified version of CALCRIM No. 3471, in pertinent part as follows:

15              A person who engages in mutual combat or who starts a
                fight has a right to self-defense or imperfect self-defense
16              only if, one, he actually and in good faith tried to stop
                fighting.
17
                Two, he indicated by words or by conduct to his opponent
18              in a way that a reasonable person would understand that he
                wanted to stop fighting and that he had stopped fighting.
19              And three, he gave his opponent a chance to stop fighting.

20              If the defendant meets these requirements, he then had a
                right to self-defense or imperfect self-defense if the
21              opponent continued to fight.

22              A fight is mutual combat when it began or continued by
                mutual consent or agreement.  That agreement may be
23              expressly stated or implied and must occur before the claim
                to self-defense or imperfect self-defense arose.
24

25   _____

26   [5] Imperfect self-defense reduces murder to voluntary manslaughter.  It applies where the
     defendant actually believed that (1) he was in imminent danger of suffering great bodily
27   injury, and (2) the immediate use of deadly force was necessary to defend against that
     danger.  At lease one of these subjective beliefs must be reasonable.  CALCRIM No.
28   571.

1    RT 388.

2            The court also instructed pursuant to CALCRIM No. 3472, modified as follows:

3    "A person does not have the right to self-defense or imperfect self-defense if he or she

4    provokes a fight or quarrel with the intent to create an excuse to use force."  RT 388.

5            The phrase "imperfect self-defense" was added to the term "self-defense" in these

6    two instructions at the prosecutor's request.  RT 389.

7            B.  The Clearly Established Federal Law

8            Error in instructing a jury violates due process only where the infirm instruction so

9    infects the entire trial that the resulting conviction violates due process.  Estelle v. McGuire, 502

10   U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  It must be established

11   not merely that the instruction is undesirable, erroneous, or even universally condemned, but that

12   it violated some constitutional right.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  The

13   challenged instruction may not be judged in artificial isolation but must be considered in the

14   context of the instructions as a whole and the trial record overall.  Estelle, 502 U.S. at 72.

15   Moreover, relief is only available if there is a reasonable likelihood that the jury has applied the

16   challenged instruction in a way that violates the Constitution.  Id. at 72-73.

17           C.  The State Court's Ruling

18           This claim was raised on direct appeal, and the opinion of the California Court of Appeal

19   constitutes the last reasoned decision on the merits and is the subject of habeas review in this

20   court.  See Ortiz, 704 F.3d at 1034.

21           The appellate court ruled as follows:

22                   Defendant contends the trial court improperly modified
                 CALCRIM No. 3471 and No. 3472 to apply to imperfect
23               self-defense as well as to self-defense. The People argue
                 defendant failed to object in the trial court to the instruction
24               and therefore forfeited the issue on appeal. However, in the
                 alternative, defendant argues defense counsel performed
25               ineffectively in failing to preserve the issue. We will
                 address the issue.
26
                     Defendant faults the given instructions as incorrectly
27               informing the jury that a person does not have the right to
                 imperfect self-defense if he or she is the initial aggressor or
28               a mutual combatant, or if the defendant provokes a fight

                                          13

1   with the intent to create an excuse to use force.

2   Defendant notes that self-defense and imperfect self-
    defense are available to a defendant who initiates a fight if
3   the victim's use of force in response was unlawful. (People
    v. Ramirez (2015) 233 Cal.App.4th 940, 947-953, 183 Cal.
4   Rptr. 3d 267.) Defendant contends that after he reached
    into Rozenski's pocket to get back his $13, "Rozenski's
5   resistance and grabbing back at Johnson, was unlawful
    because it amounted to a theft or robbery." In the
6   alternative, defendant alleges Rozenski escalated the fight:
    "[Rozenski] lunged at Johnson escalating the confrontation
7   from one involving grabbing to one involving fists.
    Rozenski further escalated that fistfight by beginning to
8   pull Johnson's dreadlocks and punch him in the head
    despite Johnson's pleas for him to stop. At that point
9   Johnson did not believe he could stop Rozenski's assault
    with his hands. Accordingly, there is a reasonable
10  probability that had the jury been properly instructed to
    focus on whether Rozenski's use of force was lawful, the
11  jury would have concluded that it was not and found that
    Johnson retained the right to claim imperfect self-defense."

12

13  The record does not support defendant's gloss on the
    evidence. Defendant fails to explain exactly how
    Rozenski's response to defendant's grabbing constituted
14  robbery or theft. Even if the jury believed defendant's
    statements to officers after his arrest, the evidence did not
15  support perfect or imperfect self-defense. Defendant did
    not plead for Rozenski to stop pulling his hair: he
16  threatened to stab him if he did not stop. Nothing before
    the jury would support a finding that defendant believed,
17  reasonably or not, that he was in imminent danger of
    Rozenski's killing him or inflicting great bodily injury and
18  that it was necessary for defendant to respond with deadly
    force to stop Rozenski. There was no evidence Rozenski
19  was armed, and there was no basis for concluding that
    defendant stabbed Rozenski out of fear for his own life.
20  The court's instructions were correct in light of the
    evidence presented.

21

22  Lodged Doc. 4 at 19-20.

23          D.  Objective Reasonableness Under § 2254(d)

24          The state appellate court decided this issue as a matter of California law, and its ruling on

25  the state law issue is not subject to review here.  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990)

26  (federal habeas corpus relief does not lie for errors of state law); Bradshaw v. Richey, 546 U.S.

27  74, 76 (2005) (a federal habeas court is bound by a state court's interpretation of state law).

28  Where there is no instructional error under the governing state criminal law, there can be no due

1 process violation.  See Spivey v. Rocha, 194 F.3d 971, 976 (9th Cir. 1999).

2        Moreover, nothing about the appellate court's review of the claim is objectively

3 unreasonable.  Petitioner has identified no United States Supreme Court precedent holding that

4 the instructions given here are unconstitutional, and this court is aware of none.  Absent such

5 precedent, the state court cannot have unreasonable applied clearly established federal law and

6 petitioner cannot prevail.  See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).

7 The state court evaluated the challenged instructions in their context, as due process requires.

8 See Estelle, 502 U.S. at 72.  Furthermore, the appellate court's rejection of petitioner's theory of

9 the evidence is far from objectively unreasonable.  The evidence before the jury failed to support

10 imperfect self-defense with or without consideration of petitioner's theory that Rozenski's use of

11 force was unlawful.  Accordingly, the failure to instruct on that theory—or the giving of

12 instructions that precluded that theory—can hardly be found to have rendered the entire trial

13 fundamentally unfair.  The state courts' rejection of petitioner's due process claim based on this

14 alleged error was not objectively unreasonable and therefore may not be disturbed.

15        III.        Claim Three: Instructional Error Regarding Torture

16                A. Petitioner's Allegations and Pertinent State Court Record

17        Petitioner challenges the trial court's rejection of his proposed torture instruction.  ECF

18 No. 1 at 8.  Specifically, he argues that the jury should have been instructed that severe wounds

19 can be consistent with a killing in the heat of passion, not only consistent with an intent to

20 torture.  Id.

21        At trial, petitioner requested the following modified instruction, which incorporated

22 CALCRIM No. 810:

23                An intent to inflict extreme pain may be inferred from the
                circumstances of the crime, the nature of the killing and the
24                condition of the body.  But you are cautioned against
                giving undue weight to the severity of Mr. Rozenski's
25                wounds, because horrible wounds may be as consistent
                with a killing in the [heat] of passion as with intent to
26                inflict cruel suffering.

27 Clerk's Transcript ("CT") 146.

28        The trial court denied the instruction because the cases petitioner relied upon for the

15

1   modification dealt with torture as a special circumstance alleged in relation to a murder charge,

2   or torture as a theory of first-degree murder.  The court explained, "The People's theory for first

3   degree murder was premeditation.  There was no other theory the [P]eople are relying on.

4   Torture is a separate charge.  And otherwise the torture instruction as it is presented by the Cal

5   Crim is the proper statement of the law.  And I find that it is an adequate instruction for the jury

6   in the case."  RT 349-350.

7          The jury was instructed pursuant to CALCRIM No. 810, without modification, as

8   follows:

9              To prove that the defendant is guilty of this crime, the
               People must prove that, one, the defendant inflicted great
10             bodily injury on someone else.

11             And two, when inflicting the injury, the defendant intended
               to cause cruel or extreme pain and suffering for the purpose
12             of revenge, extortion, persuasion, or for any sadistic
               purpose.
13
               Great bodily injury means significant or substantial
14             physical injury.  It is an injury that is greater than minor or
               moderate harm.
15
               Someone acts with a sadistic purpose if he or she intends to
16             inflict pain on someone else in order to experience pleasure
               himself or herself.
17

18   RT 386.

19              B.  The Clearly Established Federal Law

20          Error in instructing a jury violates due process only where the infirm instruction so

21   infects the entire trial that the resulting conviction violates due process.  Estelle, 502 U.S. at 72

22   (citing Cupp, 414 U.S. at 147).  It must be established not merely that the instruction is

23   undesirable, erroneous, or even universally condemned, but that it violated some constitutional

24   right.  Donnelly, 416 U.S. at 643.  The challenged instruction may not be judged in artificial

25   isolation but must be considered in the context of the instructions as a whole and the trial record

26   overall.  Estelle, 502 U.S. at 72.  Moreover, relief is only available if there is a reasonable

27   likelihood that the jury has applied the challenged instruction in a way that violates the

28   Constitution.  Id. at 72-73.

                                              16

C. <u>The State Court's Ruling</u>

This claim was raised on direct appeal, and the opinion of the California Court of Appeal

is thus the subject of habeas review in this court.  <u>See</u> <u>Ortiz</u>, 704 F.3d at 1034.

The appellate court ruled as follows:

> Defendant contends the trial court erred in refusing the modification to the instruction on torture to advise the jury that severe wounds can be consistent with a killing in the heat of passion. He argues the modification was a proper statement of the law and was crucial to his theory of defense. According to defendant, "Numerous cases have cautioned against giving undue weight to the severity of a victim's wounds in a torture prosecution because such wounds could have been inflicted in the heat of passion or during a mindless rage." In support, defendant relies on <u>People v. Cole</u> (2004) 33 Cal.4th 1158, 17 Cal. Rptr. 3d 532, 95 P.3d 811 (<u>Cole</u>) and <u>People v. Pensinger</u> (1991) 52 Cal.3d 1210, 278 Cal. Rptr. 640, 805 P.2d 899 (<u>Pensinger</u>).
>
> However, both <u>Cole</u> and <u>Pensinger</u> concerned murder by means of torture under section 189, not torture as alleged in the present case, section 206. (<u>Cole</u>, supra, 33 Cal.4th at pp. 1207-1208; <u>Pensinger</u>, supra, 52 Cal.3d at p. 1239.) Murder by means of torture is murder committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain. (<u>People v. Steger</u> (1976) 16 Cal.3d 539, 546, 128 Cal. Rptr. 161, 546 P.2d 665.
>
> Torture under section 206 does not require willful, deliberate, and premeditated intent. (<u>People v. Massie</u> (2006) 142 Cal.App.4th 365, 371, 48 Cal. Rptr. 3d 304 (<u>Massie</u>); <u>People v. Aguilar</u> (1997) 58 Cal.App.4th 1196, 1206, 68 Cal. Rptr. 2d 619.) However, defendant argues that Massie, "which is not a torture-murder case, similarly held that the severity of the victim's wounds should not be dispositive of an intent to cause cruel suffering and that a defendant who was acting in a mindless rage lacks the requisite intent necessary to uphold a torture conviction under section 206." In Massie we stated, "if the jury believes the accused acted in such a mindless rage that thought processes were impossible, then it may conclude he did not harbor the intent to inflict injury." (<u>Massie</u>, at p. 372.)
>
> In <u>Massie</u> we rejected the defendant's contention that evidence of anger precludes a conviction for torture, since the intent required need not be formed as a result of premeditation and deliberation. We noted: "An explosion of anger may be inconsistent with the reflection necessary for premeditation and deliberation, but it is not at all inconsistent with an intent to inflict cruel or extreme pain and suffering, which may be the result of 'mere unconsidered or rash impulse hastily executed.' [Citation.]"

17

1
2
3
4
5
6
7
8
9

(Massie, supra, 142 Cal.App.4th at p. 372.) We noted the role anger may have played in a criminal attack is a jury question. The jury may logically determine that anger was the reason the defendant formed the intent to inflict injury. In contrast, if the jury believes the defendant acted in a mindless rage obliterating thought processes, it may logically conclude the defendant did not harbor the intent to inflict injury. (Ibid.) This final observation does not, as defendant argues, require that the court instruct on the severity of the victim's wounds. CALCRIM No. 810, the instruction given by the trial court, adequately instructed the jury that it must find that "[w]hen inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, persuasion, or for any sadistic purpose." Accordingly, we find no instructional error.

10   Lodged Doc. 4 at 21-23.

11                   D.   Objective Unreasonableness Under § 2254(d)

12        As with the previous claim, the state appellate court resolved this issue as a matter of

13   state law.  To the extent the appellate court found that California law did not support the

14   requested modification to the torture instruction, this court may not revisit the question.

15   Bradshaw, 546 U.S. at 76.  Even if the proposed instruction was legally sound, petitioner has

16   identified no U.S. Supreme Court precedent holding that the failure to give such an instruction

17   violates due process.  The undersigned is aware of none.  Accordingly, the AEDPA precludes

18   relief.  See Wright, 552 U.S. at 125-26.

19        Finally, nothing in the trial court's rejection of the proposed instruction prevented

20   defense counsel from arguing that the evidence of Rozenski's wounds was consistent with

21   petitioner acting in the heat of passion, and therefore did not prove the specific intent element of

22   torture beyond a reasonable doubt.  Indeed, counsel did make that argument.  RT 422-423.  The

23   jury was properly instructed about the reasonable doubt standard, the inference of facts from

24   circumstantial evidence, and other principles pertinent to fact-finding about intent.  Accordingly,

25   in light of the record as a whole, see Estelle, 502 U.S. at 72, the state courts did not unreasonably

26   reject this due process claim.

27   ////

28

18

1    IV.    Claim Five:[6] _Baston/Wheeler_ Motion

2           A.    Petitioner's Allegations and Pertinent State Court Record

3           Petitioner alleges that jury selection in his case was infected by racial prejudice.  During

4    jury selection, the prosecutor exercised peremptory challenges against three black prospective

5    jurors.  Defense counsel made a _Batson/Wheeler_[7] motion after dismissal of the third of these

6    prospective jurors.   This claim rests on the dismissals of prospective Jurors No. 1 and No. 3.

7    ECF No. 1 at 8.

8           During voir dire, Juror No. 1 stated that her first thought upon seeing the defendant,

9    based on her previous experience of jury service in a murder case, was "I hope that the trial is

10   fair and objective."  Reporter's Augmented Transcript ("RAT") at 104.  When asked to elaborate

11   outside the presence of the other prospective jurors, she stated "[I]t's another African American

12   male, you know, another African American male, and that was the same as my last trial."  RAT

13   117.  Juror No. 1 noted that there had been some "racial undertones" during jury deliberations in

14   the previous case, but expressed confidence that this would not affect her ability to swerve

15   impartially in petitioner's case.  RAT 117-119.  She denied thinking that a black defendant was

16   at greater risk than others of being wrongly charged or convicted.  RAT 119.

17          Juror No. 3 was a young high school graduate who worked as an auto technician and

18   lived in North Highlands.  He did not raise his hand when the judge asked potential jurors to

19   identify themselves if they had been arrested, witnessed a crime, or been the victim of a crime;

20   his questionnaire indicated negative responses to these questions.  Clerk's Augmented Transcript

21   ("CAT") at 13.  The only time that Juror No. 3 spoke in voir dire was a brief exchange with

22   defense counsel:

23                  Q:  We haven't heard anything from you, [Juror No. 3].
                    What was the first thing you thought of when you saw my
24                  client?

25                  A:  There weren't any initial thoughts.  I only want to know
                    what happened.
26

27   _____
     [6]  The federal petition presents Claims Four and Five out of Order.  The court addresses
     them in the order presented.
28   [7]  _Batson v. Kentucky_ 476 U.S. 79 (1986); _People v. Wheeler_ 22 Cal.3d 258 (1978).

1

2

> Q:  Okay, when you heard the charges read by the judge, what was your thought?

3

> A:  Wondering, because this is all new to me, I just wondering what going to happen [sic], if he's found guilty or not.

4

5

> Q:  Can you speak up please.

6

> A:  I don't know.  I said, this is all new to me, so I wasn't sure what to expect.  So – I don't know.  I'm curious to see – I want to see the evidence.

7

8

> Q:  Okay,  And, sir, would it be fair to say you're a rather soft-spoken individual?

9

> A:  Yes, I am.

10

RAT 105.

11

When defense counsel objected to the strikes of African American jurors, the judge asked

12

the prosecutor to respond.  RAT 159.  The prosecutor responded as follows:

13

> In regards to [prospective Juror No. 3], since he was the most recent one, there were three [prospective] jurors, [No. 3], [No. 4] and. . . [No. 5].  When the Court initially asked all of the questions, those witnesses had no responses to anything.  That's the first thing that I noted with those two witnesses.

14

15

16

> Then . . . [defense counsel] asked questions in regards to jurors['] first impression of those and questions regarding drugs.  [prospective Jurors No. 5] and [No 4] piped up.  [Prospective Juror No. 3], no response.

17

18

19

> My concern with [prospective Juror No. 3] is this.  One, Juror No. 3's] age, lack of experience.  [Juror No. 3] ... he's never been a victim of a crime, he's never been arrested for a crime.  He doesn't know anybody who's been a victim of a crime.  He doesn't know anybody who was arrested for a crime.  [Juror No. 3] also lives in North Highlands, which is a high crime area.

20

21

22

23

> I don't think [prospective Juror No. 3] has any type of experience regarding life.  So I don't think he'll be able to understand the complexities of the law, or that [Juror No. 3] is simply lying about the knowledge he has about victims, arrests, et cetera.

24

25

26

> So I don't think he's credible or a very good juror for the People because he lacks any experience in anything.

27

28

RAT 159-160.

20

The prosecutor went on to address his dismissal of prospective Juror No. 1:

> [O]ne of the very first things [Juror No. 1] said was, she's wondering if the petitioner is going to get a fair trial now, something to that effect, which puts me on the defense that I have to prove my case more than something beyond a reasonable doubt.  Her . . .concern that the petitioner gets a fair trial based upon her prior experience in a jury where other people had those issues.
>
> My concern is those issues are going to come to play in my trial.
>
> So that's one thing she's concerned about, is whether or not this petitioner, an African American petitioner, is going to get a fair trial.  I don't want her to bring those biases, opinions to the courtroom.

RAT 161.

The trial court ruled as follows:

> I find that there has not been an exercise of a challenge to any of the three that are being challenged here… that is based on race basis.
>
> And what [the prosecutor] has outlined as far as his challenges are, in fact, true, that those things did happen during the course of jury selection as far as what their statements are, or in the case of [Juror No. 3], his lack of experience, and those are proper bases for any attorney, whether they are on the prosecution side or the defense side, to exercise a challenge on a particular juror.
>
> So I don't find that there is a basis to grant a [W]heeler motion as to any of the three individuals challenged.

RAT 162.

### B. The Clearly Established Federal Law

Purposeful discrimination on the basis of race in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  See Batson, 476 U.S. 79; Johnson v. California, 545 U.S. 162 (2005).  In considering whether a state court's decision is "contrary to" or "an unreasonable application of" Batson under § 2254(d)(1), the U.S. Supreme Court has recognized that Batson clearly establishes the requirement that courts perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."

Murray v. Schriro, 745 F.3d 984, 1004 (2014) (quoting Batson, 476 U.S. at 93).  State courts disobey this clearly established requirement if they "'rubberstamp' a prosecutor's proffered race-neutral explanation for exercising a disputed peremptory strike," or "misstate[ ] the test," or "impermissibly rel[y] on an erroneous factor." Id. at 1005.

Batson claims are evaluated under a three-step test:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."     [Citations]. Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]   Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]

Johnson, 545 U.S. at 168 (footnote omitted); see also Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

At the third step of Batson, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Purkett v. Elem, 514 U.S. at 765, 768 (1995).  Although the burden remains with the defendant to show purposeful discrimination, the third step of Batson primarily involves the trier of fact.  After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification."  Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them.  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion).  This credibility determination must be made in light of the totality of the relevant facts about a prosecutor's conduct.  Batson, 476 U.S. at 94; see also Hernandez, 500 U.S. at 363.

C.  The State Court's Ruling

This claim was raised on direct appeal, and the opinion of the California Court of Appeal is thus the subject of habeas review in this court.  See Ortiz, 704 F.3d at 1034.

The state appellate court ruled as follows:

22

The exclusion of prospective jurors based on their race, religion, or ethnicity violates the state and federal Constitutions. A defendant must raise the issue in a timely fashion and make a prima facie showing of racial motivation. The burden then shifts to the prosecution to present a race-neutral explanation for the challenged strikes. (Batson, supra, 476 U.S. at pp. 89, 97; Wheeler, supra, 22 Cal.3d at pp. 276-277, 280-281.) Once the prosecution states race-neutral reasons, the burden is on the defendant to show the reasons were pretextual and the prosecution's actual motivation was race. (Purkett v. Elem (1995) 514 U.S. 765, 768 [115 S. Ct. 1769, 131 L.Ed.2d 834]; People v. Reynoso (2003) 31 Cal.4th 903, 924, 3 Cal. Rptr. 3d 769, 74 P.3d 852 (Reynoso).)

On appeal, we defer to the trial court's finding of a lack of purposeful discrimination if the finding is supported by substantial evidence. Unless the record contradicts the prosecution's stated reasons, we uphold the court's finding of a lack of discriminatory intent. (People v. Alvarez (1996) 14 Cal.4th 155, 196-197, 58 Cal. Rptr. 2d 385, 926 P.2d 365; Reynoso, supra, 31 Cal.4th at pp. 923-924.)

Defendant argues the prosecution "stated a race-based reason for striking potential juror [No. 1]. He said he believed he would have to prove his case to her 'more than something beyond a reasonable doubt' because 'she's concerned about . . . whether or not this defendant, an African American defendant, is going to get a fair trial. I don't want her to bring those biases, opinions to the courtroom.'" Defendant labels the prosecution's reason "explicitly based" on race and thus the trial court erred in finding the reason race neutral. We disagree.

Prospective Juror No. 1

Prospective juror No. 1 expressed her concern that defendant would not receive a fair trial because he was a young African American male. She did not explicitly say she would hold the People to a higher standard of proof than beyond a reasonable doubt. However, given juror No. 1's comment, it was not unreasonable for the prosecution to be concerned that she would, in fact, require a higher standard of proof given defendant's age and race. The prosecution dismissed juror No. 1 because of this concern over the burden of proof, not because of defendant's race. The prosecutor's challenge need not be based on a ground that we approve of. A peremptory challenge may be based on an idiosyncratic or arbitrary reason, or even on a hunch. The question is whether the challenge was based on group bias, such as race or ethnicity. Here we find no such bias. (People v. Aleman (2016) 247 Cal.App.4th 660, 674, 202 Cal. Rptr. 3d 563.)

////

23

1

Prospective Juror No. 3

2

Defendant also argues the prosecutor's stated reasons for excusing prospective juror No. 3 were not credible. In support, defendant contends a comparative analysis of juror No. 3 and seated jurors No. 1 and No. 12 reveals the prosecution struck a potential black juror for reasons that applied to nonblack jurors he did not strike.

3

4

5

In dismissing prospective juror No. 3, the prosecutor cited the juror's lack of experience: "he's never been a victim of a crime, he's never been arrested for a crime. He doesn't know anybody who's been a victim of a crime. He doesn't know anybody who was arrested for a crime." Defendant points out that seated jurors No. 1 and No. 12 shared this lack of experience and were not dismissed.

6

7

8

9

However, in addition to prospective juror No. 3's lack of experience, the trial court also noted the juror's quiet demeanor. The court inquired of juror No. 3, "[w]e haven't heard anything from you" and asked him to "speak up." The court also asked juror No. 3 if it would "be fair to say you're a rather soft-spoken individual." After juror No. 3 agreed he was, the court asked whether despite being "soft-spoken or potentially younger than your other 12 jurors" he would be able to speak up during deliberations and discuss the evidence presented at trial. The prosecutor, in explaining his decision to strike prospective juror No. 3, referenced his quiet demeanor as well as his youth. These additional concerns differentiate prospective juror No. 3 from seated jurors No. 1 and No. 12.

10

11

12

13

14

15

16

17

Accordingly, we find no Batson/Wheeler error during jury selection.

18

19

Lodged Doc. 4 at 27-29.

20

D.  Objective Unreasonableness Under § 2254(d)

21

The California Court of Appeal correctly stated and reasonably applied Batson standards

22

at the third step, regarding the prosecutor's actual motivation for the strikes.[8]  As to Jurors 1 and

23

3, the reviewing court considered petitioner's arguments in light of the totality of relevant facts

24

regarding prosecutor's conduct.  See Batson, 476 U.S. at 94.

25

Regarding Juror No. 1, the court reasonably rejected the argument that the strike was

26

27

[8]  This court need not consider whether the preliminary portion of the three-step analysis was correctly conducted in the trial court, because the ultimate question was reached and decided.

28

24

inherently "race-based" because motivated by the juror's skepticism of the criminal justice system.  Such skepticism is not limited to African Americans by any means, and thus cannot be considered a proxy for race.  Even if Juror No. 1 had stated explicitly that she doubted the fairness of the criminal justice system vis-à-vis black defendants as a class—which she did not, in fact she denied such an opinion—the strike would have been based on her views regarding racism rather than her own race.   This is not an objectively unreasonable distinction, and there is nothing improper in the exercise of a peremptory challenge based on the view that the system is unfair.  See Tolbert, 190 F.3d at 985, 989 (strike based on a prospective juror's opinions about the judicial system does not, without more, raise an inference of racial discrimination at Batson's first step even when the opinion involves the racism of the system).  Petitioner has presented no evidence that this basis for the strike was pretextual.  See McClain v. Prunty, 217 F.3d 1209, 1221 (2000) (prosecutor's justification for a strike may be revealed as pretext for discrimination where a given explanation is equally applicable to a juror of a different race who was not stricken).  As the appellate court noted, a reviewing court need not approve of a strike to find that a Baston challenge fails for lack of proof.

Regarding Juror No. 3, the undersigned is troubled by the prosecutor's passing intimation that a young black man from North Highlands must be lying about not knowing anyone who has been the victim of a crime or arrested for a crime.  The appellate court did not address the question whether this specific comment reflected racial bias.[9]  However, to the extent that petitioner argued other jurors without personal experience of crime were not similarly excluded, the appellate court correctly noted that neither of those other jurors were so soft-spoken that their

---

[9]  The undersigned finds that any suggestion of bias raised by the prosecutor's comment would have supported a prima facie case of discrimination at step one of the Batson analysis.  This does not change analysis of the step three determination, however, which turns on the credibility of the prosecutor's inexperience and demeanor rationales in light of the record as a whole.  Any inference of implicit racial bias in the prosecutor's suspicion that Juror No. 3 was untruthful about his lack of experience is too weak to render the courts' credibility and demeanor determinations objectively unreasonable.  It is clear from the record that both the prosecutor and defense counsel were concerned that Juror No. 3 might be passive in deliberations and unable to speak up and discuss the evidence.  See RAT 105-106 (defense counsel asking whether Juror No. 3's soft-spoken nature and youth would cause him to hesitate to express himself in deliberations).

demeanor presented questions about the ability to participate during deliberations.[10]  The record

of voir dire supports this distinction between Juror No. 3 and the jurors identified by the defense,

making the appellate court's rejection of petitioner's comparative juror analysis reasonable.

Accordingly, Juror No. 3's demeanor was reasonably found not to have been asserted as a

pretext for invidious discrimination.  See McClain, 217 F.3d at 1221.  There is no basis in the

record for this court to find that the state appellate court unreasonably affirmed the trial court's

credibility and demeanor determinations.  See Miller-El v. Dretke, 545 U.S. 231, 240 (2005); see

also Snyder v. Louisiana, 552 U.S. 472, 477, 479 (2008).

In sum, the state courts applied the correct standard under Batson, reasonably evaluated

the challenged strikes in the context of the circumstances as a whole, considered petitioner's

arguments rather than rubberstamping the prosecutor's proffered reasons, and relied on no

impermissible factors.  Accordingly, there was no objectively unreasonable adjudication of the

issue.  See Murray, 745 F.3d at 1005.  The AEDPA therefore precludes relief on this claim.

V.  Claim Four: Cumulative Error

Petitioner alleges that the combination of trial errors asserted in his other claims violated

his Fifth and Fourteenth Amendment rights.  ECF No. 1 at 42.  The U.S. Supreme Court has

clearly established that the combined effect of multiple trial court errors violates due process

where it renders the resulting criminal trial fundamentally unfair.  Chambers v. Mississippi, 410

U.S. 284, 298, 302-03 (1973).  The cumulative effect of multiple errors can violate due process

even where no single error rises to the level of a constitutional violation or would independently

warrant reversal.  Id. at 290 n.3.

On direct appeal, the state court concluded summarily that it "found any error harmless,

---

[10]  The appellate court misstated the record in attributing defense counsel's comments at RAT 105 to the trial judge.  The court seems to have followed the uncorrected misattribution of the statement in Respondent's Brief on Appeal, Lodged Doc. 2 at 63. This error has no effect on the Batson analysis, however.  The fact remains that the prosecutor was not the only one to comment on Juror No. 3's quietness.  Arguably, it weighs even more strongly against the Batson claim that defense counsel recognized the possibility that the juror's demeanor and age presented legitimate questions about his suitability to serve on the jury.

and any errors combined do not compel the conclusion that [petitioner] was denied a fair trial." Lodged Doc. 4 at 23 n.6.  There is nothing objectively unreasonable about this conclusion.  The appellate court identified a single trial error—the prosecutor's misstatement of the law in his closing argument—but found it harmless beyond a reasonable doubt.  Because there cannot be a cumulative effect from a single error, this claim fails.  United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012) ("There can be no cumulative error when a defendant fails to identify more than one error.").

VI.    Petitioner's Reliance on *United States v. Johnson*

Petitioner filed a motion for relief from judgment based on United States v. Johnson, 576 U.S. 591 (2015), ECF No. 14, which the undersigned denied without prejudice as a housekeeping matter and deferred for consideration on the merits here.  ECF No. 19. Respondent was directed to address petitioner's argument in his answer to the petition, and petitioner was provided an opportunity to respond in his reply brief.  Id.  Respondent briefed the issue, ECF No. 26 at 46, but petitioner did not file a traverse.

Petitioner argues that Johnson renders his conviction for second degree murder unconstitutional.  ECF No. 14.  Johnson did not involve the constitutionality of the California second degree murder rule, however.  Rather, Johnson found the residual clause of the Armed Career Criminal Act ("ACCA") to be unconstitutionally vague.  The ACCA provides for increased sentences in federal cases where the defendant has prior convictions for crimes of violence.  The now-invalidated residual clause provided for increased sentences where the federal defendant had a prior conviction for a felony that "otherwise involves conduct that presents a serious potential risks of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii). The Court held that this language was so indeterminate that it "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates."  Johnson, 576 U.S. at 592.

Johnson provides no basis for relief in this case.  Petitioner was not sentenced in federal court under the ACCA, so its holding is entirely inapposite.  To the extent petitioner means to suggest that the California second-degree murder rule is itself unconstitutionally vague, other courts have rejected the argument that Johnson compels such a conclusion.  See, e.g., Renteria v.

27

1    Asunsion, No. CV 16-6874 R (FFM), 2016 WL 7336558, at *3, 2016 U.S. Dist. LEXIS 174456,

2    at * 6-7 (C.D. Cal. Dec. 16, 2016); Lively v. Spearman, No. CV 18-02760-TJH (AGR), 2018

3    WL 7457934, *8, 2018 U.S. Dist. LEXIS 221783 *21-22 (C.D. Cal. Dec. 18, 2018).   In any

4    event, the only way in which Johnson might be even arguably relevant to California second-

5    degree murder is in the felony murder context, in which a second-degree conviction requires

6    proof that the defendant was engaged in felonious conduct that was "inherently dangerous to

7    human life."  See People v. Chun, 45 Cal. 4th 1172, 1182 (2009) (second-degree felony murder is

8    an unlawful killing in the course of the commission of a felony that is inherently dangerous to

9    human life but is not included among the felonies enumerated in Cal. Penal Code section 189).

10   In this case, petitioner was not prosecuted for felony murder, and the jury was not instructed as

11   to conduct "inherently dangerous to human life."  Because petitioner was not convicted under a

12   standard even arguably analogous to the ACCA's residual clause, Johnson has no applicability

13   here.

14        To the extent that petitioner asserts Johnson as a free-standing basis for relief, the claim is

15   unexhausted and therefore could not provide a basis for relief even if it were colorable.  See 28

16   U.S.C. § 2254(b) (no federal relief unless applicant has exhausted state court remedies); Castille

17   v. Peoples, 489 U.S. 346 (1989) (exhaustion requires presentation of claim to state's highest

18   court).  Neither a Johnson claim nor any challenge to the constitutionality of second-degree

19   murder was presented to the California courts following petitioner's conviction.  To the extent

20   that petitioner presents Johnson as supplemental authority in support of his exhausted claims, it

21   is inapposite for the reasons explained above.

22                                          CONCLUSION

23        For all the reasons explained above, the state courts' denial of petitioner's claims was not

24   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

25   HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

26        These findings and recommendations are submitted to the United States District Judge

27   assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

28   after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 13, 2022

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE